## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:10-CR-03090-DGK |
| | ) | |
| ULYSSES JONES, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING *ATKINS* MOTION

Now before the Court is Defendant's Motion for Pretrial Determination That the Imposition and Execution of the Death Penalty is Barred Based Upon Ulysses Jones' Intellectual Disability and Request for a Hearing (Doc. 158). After carefully considering all the evidence, the Court finds Defendant has not carried his burden of showing by the preponderance of the evidence that he is intellectually disabled under *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny.

In fact, the Government demonstrated Defendant does not have intellectual disability. The credible evidence and testimony shows that Defendant was developmentally delayed as a child, but his development "caught-up" as an adult, as demonstrated by significant evidence in the record, including his own writings, evaluations from numerous mental health professionals, and his passing the GED exam in 1985. While Defendant presently suffers from a significant neurocognitive defect, this is the result of his end stage renal disease and a severe head injury he sustained in April of 2007, sixteen months after the crimes in this case occurred.

The motion is DENIED.

## Findings of Fact

The Court held a four-day evidentiary hearing on this issue over an eight day period, from March 13, 2017, to March 20, 2017.[1]  During the hearing, Defendant presented live testimony from two expert witnesses, Dr. Stacey Wood ("Dr. Wood") and Dr. Daniel Reschly ("Dr. Reschly"), and three of Defendant's cousins:  Bessie Harris, Glenda Thompson-Dunn, and Phyllis Shipman.  Defendant also submitted 23 exhibits.  The Government presented testimony from two experts, Dr. Robert Denney ("Dr. Denney") and Dr. Jack Naglieri ("Dr. Naglieri"), and a dialysis technician, Nickole Anderson, who has frequent contact with Defendant.  It also presented 73 pieces of documentary evidence and two demonstrative exhibits.  Both parties submitted voluminous post-hearing briefs.

The following summarizes the most relevant testimony and the Court's credibility findings.[2]  Although this summary discusses some of the evidence in detail, the Court's failure to discuss any particular piece of evidence should not be construed as a comment on its probative value.  In concluding Defendant is not intellectually disabled, the Court has carefully considered all of the evidence in the record.

### Dr. Stacey Wood

The Defense retained Dr. Wood to conduct a comprehensive neuropsychological assessment of Defendant.  She has previously worked on numerous cases involving *Atkins* issues.  Dr. Wood holds a Ph.D. in clinical neuropsychology from the University of Houston and

---

[1] The hearing was held over an eight-day period to accommodate Defendant's dialysis schedule and out of an abundance of caution to ensure that he would be able to meaningfully participate.  At the time, Defendant was housed at the Federal Medical Center in Butner, North Carolina.  Since being moved to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP Springfield" or "FMCFP Springfield"), Defendant's health has improved and his dialysis schedule has been altered.  Reports from his attending doctors now indicate his health and dialysis schedule will permit him to attend a full day of trial three days a week, on Monday, Wednesday, and Fridays, and half-days two days a week, on Tuesday and Thursdays.

[2] Portions of this summary draws heavily from the parties post-hearing briefs, particularly the Government's.

participated in a post-doctoral fellowship in clinical neuropsychology from the University of California at Los Angeles in both psychiatry and neurology. Although a licensed psychologist, she is not board certified in her specialty, geropsychology, nor is she board certified in neuropsychology or forensic psychology.

Her work in this case concerned the first prong in the *Atkins* analysis, whether Defendant has significantly subaverage intellectual functioning. Dr. Wood administered an IQ test, the Wechsler Adult Intelligence Scale-IV (WAIS-IV), to Defendant in October of 2014 and prepared a report of her findings. She determined that as of October 2014 (that is, seven years after Defendant's head injury), he had a full scale IQ of 70 comprised of the following scores: 63 on the verbal comprehension index, 81 on the perceptual reasoning index or performance IQ, 80 on the working memory index, and 76 on the processing speed index. Dr. Wood opined that Defendant's IQ "score likely represents a decline secondary to impaired language abilities and slowed processing speed resulting from his complicated traumatic brain injury and other medical conditions." Dr. Wood's Neuropsychological Evaluation at 11-12 (Doc. 251-1).

Dr. Wood's in-court testimony was consistent with her report. Particularly relevant to the *Atkins* determination, she acknowledged that Defendant's score of 63 on the verbal index dragged down his full scale IQ score, and that the low verbal index score could have been the result of lack of schooling, educational opportunities, and the amount of time he spent in jail. She also acknowledged his low verbal score had no impact on his performance IQ. Dr. Wood also testified that, based upon Dr. Denney's evaluation, she believed Defendant's cognitive abilities declined further from the time of her evaluation in 2014 to Dr. Denney's evaluation in 2016.

Dr. Wood did not adjust the IQ score on the WAIS-IV for the "Flynn Effect"[3] in her report, but, at defense counsel's request, she adjusted the scores in her in PowerPoint presentation for the *Atkins* hearing. She testified she does not normally correct for the Flynn Effect when she is doing a contemporaneous assessment using the most recent test version, but she did do so here.

Dr. Wood acknowledged that if Defendant's cognitive impairment was the result of events from later in his life, such as brain damage from his head injury and decline from years of renal failure, a diagnosis of intellectual disability would be inappropriate.

The Court finds her report and testimony generally credible.

**Dr. Daniel Reschly**

Dr. Reschly was hired to provide expert testimony on behalf of the defense. In his report and testimony, Dr. Reschly opined that Defendant met the definition of intellectually disabled as a child, adolescent, and adult. He opined Defendant's current intellectual functioning was between 65 and 75, and that he has had adaptive behavior deficits in everyday functioning since childhood and continuing into his adult years which were associated with significant limitations in functional intelligence. He opined that Defendant had significant limitations in intellectual functioning in childhood as demonstrated by full-scale IQ scores of 66 at age 6, 72 at age 15 (Flynn Effect corrected to 65), and 70 in 2014. Based on Vineland-II Adaptive Behavior Scales ("VABS-2") survey forms completed from information provided by two of Defendant's younger cousins, Luella Harris and Bessie Harris, Dr. Reschly opined that Defendant had significant deficits in adaptive behavior during childhood in each of the adaptive behavior domains

---

[3] The Flynn Effect posits that average IQ scores for a given IQ test increase over time, and so to adjust for this increase, present scores should be reduced by approximately 0.3 IQ points per year for each year since the test was last normed. The practical effect of this adjustment is that if an IQ test has not been normed in several years, the test subject's IQ score will be lowered.

identified by the American Association on Intellectual and Developmental Disabilities ("AAIDD")[4] and by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").

As for the opinions of the numerous psychologists and psychiatrists who evaluated Defendant over the years and diagnosed him with antisocial personality disorder ("ASPD") and not intellectual disability, Dr. Reschly dismissed their opinions as a classic case of diagnostic overshadowing (clinicians overlooking mild intellectual disability in favor of another diagnosis).

The Court gives Dr. Reschly's testimony limited weight and his conclusions no weight.[5] As a threshold matter, Dr. Reschly lacks significant experience and credentials in the subject matter as it relates to this particular case, performing a forensic evaluation on a prisoner in a prison setting. Dr. Reschly is an expert in special education and in assessing mild intellectual disability in school children, but he has never been licensed to practice psychology outside of a school setting, and he is not currently licensed to practice any form of psychology in any place in the United States.[6] He has also never practiced clinical psychology, forensic psychology, or neuropsychology, nor does he have any meaningful experience evaluating patients in a forensic setting such as a hospital or prison, which is what this case involves. Although he admitted he lacked competence to diagnose ASPD, this did not prevent him from testifying that Dr. Denney's diagnosis was wrong.

---

[4] AAIDD was previously known as the American Association on Mental Retardation.

[5] Some of Dr. Reschly's testimony concerning the history of IQ testing provided helpful background information for other testimony the Court heard later.

[6] The Court notes Dr. Reschly testified that he was licensed in Iowa, which was not true. *Atkins* Hr'g Tr. at 295-299 (Doc. 275). The Court also notes Dr. Reschly testified under oath before a federal judge in another death penalty case that he was a licensed psychologist when he was not, and the court in that case would not have permitted him to testify had it known that he was not a licensed psychologist. Tr. at 301-03. These incidents detract from Dr. Reschly's credibility.

Also, Dr. Reschly's analysis and testimony were results-oriented. Dr. Reschly started from a conclusion—that Defendant has been intellectually disabled since childhood—and then worked backward to identify evidence and develop a rationale supporting this conclusion. For example, he assumed that a report card showing Defendant earned several Cs must have shown grades from special education classes, even though nothing in the report card indicated these were special education classes. Dr. Reschly should have considered that those grades could have been from regular classes. He did not, apparently because Defendant receiving "C" grades in regular classes would be inconsistent with his conclusion. Dr. Reschly also avoided evidence which would undercut his conclusion, such as the opinions of several mental health professionals with the federal Bureau of Prisons ("BOP") who evaluated Defendant over many years and never found him to be intellectually disabled. An unbiased expert would have attempted to contact these doctors and learn why they did not believe Defendant was intellectually disabled.

Dr. Reschly's opinion is also inconsistent with several key facts. The Court heard undisputed testimony that individuals with mild intellectual disability tend to be "pleasers" who are compliant with authority figures. On the other hand, individuals with ASPD are not typically compliant unless it is in their best interest. The overwhelming evidence in this case is that Defendant is not, and never has been, a "pleaser" or compliant with authority figures. It is also very rare for an individual with intellectual disability to receive a General Education Diploma ("GED"). Yet Dr. Reschly testified that the fact Defendant had received his GED did not "confirm" or "disconfirm" that he was intellectually disabled. Tr. at 265. While this is, strictly speaking, correct—since theoretically no single piece of evidence is dispositive, a GED does not automatically rule out this diagnosis—it is very weighty evidence against intellectual disability. The Court finds crucial portions of Dr. Reschly's analysis, such as his description of Luella

Harris and Bessie Harris as competent informants about Defendant's adaptive behavioral skills in his developmental years, to be so lacking in credibility that it casts a shadow over his entire analysis.

Finally, the Court finds Dr. Reschly's demeanor while testifying was, at times, incongruous with that of a disinterested witness. Dr. Reschly was always pleasant and unfailingly polite, but at important moments during the Government's cross-examination he was noticeably evasive in answering some questions.

**Defendant's cousins: Bessie Harris, Glenda Thompson-Dunn, and Phyllis Shipman**

Ms. Harris is Defendant's first cousin. She was born in 1958, making her two years younger than Defendant. She testified that she had more significant contact with Defendant during his elementary school years when she would see him at her grandmother's house. She testified Defendant stuttered during that time period, was slower than the other kids when it came to reading and playing games, and he could not learn to play chess. His cousins and neighbors laughed at him, and his father was very abusive towards him. He needed extra help in school, but did not receive any.

Ms. Thompson-Dunn is three years older than Defendant. She graduated from high school and recently retired from being a peer educator in special education. She testified she helped Defendant with his schoolwork when he was 9 and 16 years-old, and that he had difficulty reading and performing math. In fact, he had trouble counting to fifteen when he was 16 years-old. Kids teased him and picked on him.

Despite testifying that she helped him with his schoolwork when he was 16 years-old, Ms. Thompson-Dunn said was not familiar his criminal conduct in his teenage years. She also struggled to remember where she or Defendant lived at that time.

Ms. Shipman is a retired registered nurse who was born in 1952. She saw him more while she was living with her grandmother from 1965 to 1967, when she was approximately 13 to 16 years-old, and Defendant was 9 to 12 years-old. She remembers Defendant's father being physically and verbally abusive to him. She also remembers his mother trying to help him with his reading and math, and her complaining that he was very slow.

She had limited interaction with Defendant. She did recall him coming back from the corner store with incorrect change. He could not make change—he thought a quarter and a nickel were the same—but his younger brother could. Defendant stuttered and did not talk much. She described him as "regressed" in comparison to her other cousins, and that he was teased by them for being "dumb" and "stupid."

Ms. Shipman testified that Defendant did not like school, and that on one occasion after he got in trouble in elementary school, he broke into the school in retaliation. She stopped having regular contact with Defendant when he was approximately eleven years-old.

The Court believes all three of witnesses testified truthfully to the best of their abilities. They are very nice ladies. But their memories of what Defendant was like almost fifty years ago are incomplete and unreliable, and doubtlessly clouded by their familial love for him and desire that he not receive the death penalty. The Court finds none of these witnesses' are reliable sources of information about Defendant's developmental years.

**Dr. Robert Denney**

Dr. Denney is a psychologist licensed in the state of Missouri. He is board certified in neuropsychology as well as forensic psychology. Dr. Denney was a practicing psychologist with the BOP from 1991 through 2011. He has excellent credentials and extensive relevant experience. His demeanor was candid and straightforward. The Court finds his testimony very credible and gives it significant weight.

Dr. Denney met with Defendant over two days in June of 2016 and administered the WAIS-IV in an attempt to calculate his IQ. He also attempted to conduct a clinical interview of Defendant in person, but Defendant refused to answer additional questions once Dr. Denney began asking about his childhood. Before Defendant ended the interview, he stated he authored and wrote the six letters/pleadings contained in Exhibit 34.

Dr. Denney determined Defendant's full scale IQ was 63, with a composite score on the performance aspect of 75. In his September 16, 2016, report, he concluded that:

> Currently, Mr. Jones has significant neurocognitive deficits that in my professional opinion result from a combination of chronic small vessel disease secondary to long term hypertension and renal failure and the result of his complicated brain injury. In my professional opinion, these deficits warrant a diagnosis of Major Neurocognitive Disorder from multiple etiologies.
>
> * * *
>
> In my professional opinion, Mr. Jones may have warranted an I.D. diagnosis in his early elementary years, but by the time he reached his teenage years, his general intellectual ability more approximated the below average to upper borderline range due to maturation.[7] He demonstrated a Specific Learning Disorder,

---

[7] Both Dr. Denney and Dr. Reschly recognize that claims of mild mental retardation or intellectual disability can be transitory, especially when they are the basis of educational deficiencies and not organic deficiencies. *See* Reschly "Non-Biased Assessment and School Psychology" (1978) pg. 17-18 ("mild retardation . . . is not permanent . . . [and

characterized by impairment in reading, written expression, and mathematics. He grew out of the Learning Disorder as an adult. He also displayed a severe Conduct Disorder as a young child, which developed into an entrenched maladaptive personality style comprised of severe antisocial characteristics such that he met diagnostic criteria of Antisocial Personality Disorder. In my professional opinion, Mr. Jones did not have Intellectual Disability at the time of the alleged offenses. He currently meets the clinical diagnoses of Major Neurocognitive Disorder due to multiple etiologies and Antisocial Personality Disorder.

Dr. Denney's Neuropsychological Report at 25-26 (Doc. 259-4).

Dr. Denney wrote an addendum on February 17, 2017, the subject of which is particularly relevant to this Order. In it, he reported the results of his interviews with three of Defendant's cousins: Luella Harris (born in 1960 and a source of information for Dr. Reschly), Glenda Thompson-Dunn (who later testified at the *Atkins* hearing), and Bessie Harris (born in 1958 and who was both a source of information for Dr. Reschly and testified at the *Atkins* hearing).

Dr. Denney noted that when he asked Luella Harris about her clearest memories of Defendant as a child, she indicated that she had suffered three strokes and "my memories are not the best now." Addendum at 1 (Doc. 259-5). Although she attempted to be helpful, "I remember some when he was young and I remember some when he was older and had a girlfriend—so you just ask me," she remembered quite little. *Id.*

Because Ms. Thompson-Dunn is three years older than Defendant and claimed to have memories from routinely seeing him when he was 16 years-old, Dr. Denney asked her to complete a retrospective analysis about Defendant. This form required her to assess Defendant in many different skill areas (communication, social, self-care, etc.). Her ratings of Defendant

---

it is a] well known fact that the vast majority of the mildly retarded are deficient only in a fairly narrow range of competencies (those associated with formal education)").

were the lowest they could be; they were so low that "he would have been virtually incapable of functioning with others in the family or neighborhood." *Id.* at 5-6. Ms. Thompson-Dunn also reported guessing at such a high number of questions it suggested she did not have a very good memory of him. Dr. Denney concluded the results were "likely not a valid reflection of his functioning" and "appeared biased in a downward direction." *Id.* at 6.

As for Bessie Harris, Dr. Denney observed she was not a permissible reporter for a retrospective analysis because she was younger than Defendant. She did provide some relevant information, however. She questioned why attorneys were talking with Ms. Thompson-Dunn about Defendant. She said Ms. Thompson-Dunn did not know Defendant since she never spent time around him, and she could not remember anything because she was on a lot of pain medication for her back. In light of the above, Dr. Denney concluded "these ladies recollections of the defendant are not accurate enough to serve as reliable sources of information about his developmental years." *Id.* at 7.

Dr. Denney's testimony at the hearing was consistent with his report and addendum. He opined that, "[i]n my professional opinion, within a reasonable degree of scientific certainty, Mr. Jones does not have the diagnosis of intellectual disability." *Atkins* Hr'g Tr. at 499 (Doc. 276). Dr. Denney also testified about the significance of other explanations for Defendant's poor school performance, poor attendance, and criminal conduct. Dr. Denney testified the school records showed antisocial characteristics which eventually blossomed into ASPD.

Dr. Denney explained Dr. Reschly's description of Defendant's juvenile misconduct, truancy, and poor grades as manifestation of intellectual disability, was flawed. Defendant's difficulty with reading, writing, and arithmetic throughout his elementary years did not evidence intellectual disability, but an undiagnosed learning disorder. The numerous writings and

pleadings Defendant authored in prison, combined with his earning his GED, demonstrate he eventually developed to the level of a high school junior or senior.

Dr. Denney also disagreed with Dr. Reschly's characterization that it is common for someone with intellectual disability to also have ASPD. Dr. Denney testified that from the time Defendant began elementary school, Defendant exhibited behaviors meeting the diagnostic criteria for ASPD. Dr. Denney also noted these kinds of behavior would interfere with Defendant's ability to learn:

> If a child is fighting with teachers, fighting with schoolmates, doesn't want to come to school, would rather run the streets and be in gangs than to learn how to read, write, and do all the things that they need to do to get their academic skills up to its full potential, they will not get there. And that's why I see the improvement with Mr. Jones as he goes into adulthood. Now he's applying himself and learning the ability -- learning the things he needed to learn in school that demonstrated the fact that he could learn it, which is not consistent with intellectual disability.

Tr. at 610-611.

### Nickole Anderson

Witness Nickole Anderson is a dialysis technician at the United States Medical Center for Federal Prisoners in Butner, North Carolina. In that capacity, she has interacted with Defendant for approximately three and a half to four hours a day, three days a week, for much of the past ten years. She estimated she has spent more than 5,000 hours with him. The Court finds her to be a very credible observer and reporter of Defendant's abilities.

Ms. Anderson described Defendant as "a very intelligent man" who can perform dialysis calculations in his head. She marveled at his ability to manage his kidney disease. She noted he monitored his lab tests and knew in what range his different levels needed to be. He was so

knowledgeable about dialysis that he could educate the prison staff about how to set up the dialysis machine.

She also testified he used to do a lot of writing before he developed carpal tunnel syndrome in his hands, and that his handwriting was very neat. She also described his drawings as very artistic.

**Dr. Jack Naglieri**

Dr. Naglieri is the Director of School Psychology Programs at George Mason University and the author of the Naglieri Non-Verbal Ability Test. He has taught, developed tests, and testified concerning the difficulties of testing disadvantaged children in poor areas. He has been licensed as a psychologist in Ohio, New York, and Virginia, but he is not currently licensed.

Dr. Naglieri testified about the development of intelligence tests. Of particular note, Dr. Naglieri stressed that the different subtests of intelligence (verbal and non-verbal) are simply different measures of intelligence, not measures of different intelligence. He testified that the Weschler IQ tests do not measure verbal intelligence and nonverbal intelligence, rather, they measure general ability using verbal tests, quantitative tests, math, etc. Dr. Naglieri testified that children from low-income areas tend to have lower verbal IQ scores because they are exposed to fewer words than children from high socioeconomic levels, so they do not have the opportunity to learn all the vocabulary used on the tests. Thus, if Defendant had a limited opportunity to learn before being tested, the test might unfairly penalize him for not having learned this background content, resulting in a misleadingly low score.

The Court finds his testimony to be credible.

### Documentary Exhibits

There were more than 1,000 pages of documentary exhibits introduced in the *Atkins* hearing. The most notable are summarized below.

### School Records

Defendant's elementary and middle-school records show Defendant was frequently absent and disinterested in school, and that he exhibited anti-social behavior from a young age. At one time, he participated in an attempted rape in an empty classroom. These records also demonstrate that from the time he began attending school he had low grades, sometimes very low grades, even during the year he repeated first grade when he only missed a few days of school.

### GED Certification

Exhibit 24 is certification from the Illinois State Board of Education that Defendant passed the GED examination in 1985. Although this paperwork juxtaposes two digits of Defendant's Social Security number, it identifies Defendant by his name and date of birth. Although the defense speculated that this error might mean that the passing grade on the certificate belongs to someone else, or that Defendant could have passed the exam by cheating, perhaps by having someone take the exam for him, no evidence supports any of these claims. On the contrary, the Court heard credible testimony that the education department within the BOP administers GED tests under tight security, particularly within the Control Unit at United States Penitentiary, Marion ("USP Marion"), where Defendant took the test. There is "no chance that a Bureau of Prisons educational staff person would be even able to allow a different inmate to take the test." Tr. at 548-49. The Court finds the juxtaposed digits on the Social Security

number is a typographical error; that Defendant is the individual who actually took the test; and that he earned the reported score and passed the GED exam.

The Court also notes Defendant's score placed him in the top 51.6 percent in the country, suggesting Defendant performed at an academic achievement level equal to, or exceeding, that of a high school senior. There was also testimony that those individuals who took the GED test, regardless of whether they actually passed it, performed better than graduating high school seniors as a whole. So earning a GED is arguably more difficult than graduating from high school.

### BOP Records

The record also includes approximately 32 communications from Defendant to prison officials, judges, and attorneys that are in Defendant's BOP file. These documents cover a range of subjects, from prison grievances to an attempted contract negotiation with the Gibson Greeting Card Company. Some of these documents are printed, some are hand-written in cursive, and some are typed.

The defense suggests Defendant might not have authored some of these writings, they could have been written with the assistance of another inmate or by a jailhouse lawyer. Although this is possible, there is no evidence that anyone other than the Defendant authored them. In fact, Defendant explicitly confirmed to Dr. Denney that he authored six of these.[8] Even limiting consideration to the six documents Defendant specifically authenticated, these demonstrate reasoning and writing skills inconsistent with intellectual disability.

For example, Exhibit 71 is a draft copy of a letter Defendant admitted writing to propose a business enterprise with the Gibson Greeting Card Company. (The letter became part of

---

[8] Of course, Defendant could have been lying and saying this because he was embarrassed and did not want to admit that he could not write them. While this is possible, there is no evidence of this.

Defendant's prison file because he was discovered in the law library typing it in violation of the

rule that inmates use the typewriter for legal matters only.)  The letter states:

> Before i go any deeper in this letter.  I would like for you to know
> that i'am incarcerated, and i've been for awhile now. I truly hope
> and pray this does'nt affect the business deal i'am trying to
> conduct with you.   Being incarcerated is why i can't make a
> personal appearance, nor will i be able to contact you by telephone.
> Because the prisoners only get one (1) phone call a month, for just
> ten (10) minutes.  And I use that call to to check on my love ones.
> Anyway, ten (10) minutes wouldn't be enough time to conduct
> some kind of business deal.

The draft has handwritten edits to correct syntax errors or content.  For example, Defendant

struck out "love ones" and replaced it with "mother." *Id.*

Exhibit 68, is a handwritten letter Defendant wrote to Judge Bacon in the District of

Columbia and filed on May 27, 1980.  It states, in part:

> Your Honor:
>
> I move this Honorable Court to closely examine the attached letter
> (Marked Exhibit "A") I wrote to my Court-appointed lawyer, Mr.
> James M. Doyle.  This letter is my Pro se effort to bring to my
> lawyer's attention what I want done and what I see.  It is not
> intended that my lawyer limit himself to just what I want done in
> my case. But I face very, very serious charges.  I want him to do
> whatever it takes to get me FREE.  Mrs.,  I'am not trying to be no
> lawyer but I just want you to know that I wrote the attached letter
> to my lawyer.
>
> >    Thank you,
> >
> > Respectfully submitted
> >
> > *Mr. Ulysses Jones, Jr. pro se*
>
> I declare under penalty of perjury that the foregoing is true and
> correct  This 20 day of May 1980.

[It is signed by a purported notary.]

**Criminal Offense Information**

Exhibit 16 contains records from the investigative file into the murder of Timothy Baker and the stabbing of Robert Ryan. Included in these documents is a record of an attempted interview with Defendant a few hours after the crimes were committed. It shows that after officers read Defendant his *Miranda* rights, he declined to speak with them. By invoking his Fifth Amendment right, Defendant exhibited an understanding of what the right to silence means and how to invoke it.

Included in Exhibit 16 is a transcript of a recorded phone call made between Defendant and his brother fifteen days after the crimes occurred. In it, Defendant tells his brother that he was being accused of murder and attempted murder, and that he cannot talk about the case, but that it was self-defense. These remarks display an awareness that anything he said in the conversation could be used against him later, that as a matter of prudence it was best that he not talk about the case, and that a theory of self-defense would allow him to acknowledge the evidence showing he killed Mr. Baker and stabbed Mr. Ryan, yet relieve him of criminal responsibility.

The Government also introduced investigative reports from investigations into Defendant's prior crimes. These reports document that in order to avoid being convicted Defendant would lie, attempt to shift responsibility for an incident by blaming the victim, or invoke his right to remain silent.

As a whole, these documents show Defendant tends to be a leader, not a follower; that he understands what abstract legal rights are—like the right to remain silent; and that he has the ability to make plans and strategize.

### BOP Psychological Records

Exhibit 29 contains different psychological examinations performed on Defendant while in prison. They include a comprehensive psychological examination performed in 1984 by two psychiatrists as a precursor to placing Defendant in the Control Unit at USP Marion.[9] They concluded Defendant had "estimated low normal intelligence" and likely an antisocial personality disorder, but no significant mental diseases or defects. This examination is significant because at the time no prisoner with a significant mental disease or defect—including intellectual disability —could be placed in Marion's Control Unit. If these psychiatrists believed Defendant were intellectually disabled, they would have noted it.

Also included in Exhibit 29 is a mental health evaluation of Defendant by Dr. Henry E. Edwards, Chief of Mental Health Services for the Department of Corrections. Dr. Edwards saw Defendant on November 5, 1996, and found he was alert, oriented, cooperative, and lacked any evidence of significant mental illness or disorder. In preparation for this *Atkins* hearing, the Government contacted Dr. Edwards and he completed a follow-up form stating he strongly believed Defendant was not intellectually disabled.

Other mental health evaluations include two prepared by Dr. Denney in the late spring and summer of 1991 when he was an intern with the USMCFP Psychology Department. Dr. Denney spoke with Defendant several times as part of his training. None of these evaluations indicated Defendant had any significant mental problems.

---

[9] In 1984, USP Marion was the "super max" in the BOP, and Marion's Control Unit was where the most dangerous prisoners within Marion were housed. Defendant was sent to USP Marion after participating in the murder of a fellow inmate in the Lorton, Virginia, prison.

**Standard**

In an *Atkins* proceeding, the defendant bears the burden of proving intellectual disability by a preponderance of the evidence. *United States v. Umana*, 750 F.3d 320, 358 (4th Cir. 2014). In determining whether a defendant is intellectually disabled, courts use the definition found in the DSM-5, which is substantially similar to the one published by the AAIDD. *Atkins*, 536 U.S. at 308 n.3; *see Ortiz v. United States*, 664 F.3d 1151, 1157 (8th Cir. 2011) (applying DSM-4). The DSM-5 states:

> The essential features of intellectual disability (intellectual development disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardize testing of intellectual and adaptive functions.

**Discussion**

**I.      Defendant's GED is inconsistent with his claim of intellectual disability.**

Defendant passed his GED in 1985 which makes it extremely unlikely that he is intellectually disabled. *See, e.g.*, *Hines v. Thaler*, 456 F. App'x 357, 369 (5th Cir. 2011) (holding the defendant was not intellectually disabled in part because he was able to secure a GED, "an indicator of some general intellectual capacity;" while the defendant claimed he cheated with the illegitimate aid of a test administrator, there was no evidence to support this); *United States v. Candelario-Santana*, 916 F. Supp. 2d 191, 221 (D.P.R. 2013) (denying defendant's claim of intellectual disability, holding the GED the defendant obtained while incarcerated "suggests that he was capable of high-school level academic achievement" and, therefore, "it is simply not credible to think that [the defendant's IQ] test results were an accurate

19

reading of his abilities."). In fact, Courts have uniformly declined to find a defendant who received a GED to be intellectually disabled.

The Court also notes that Defendant's GED scores are well above the threshold for passing. The average graduating high school senior earns a standard score of 50. Thus, Defendant's score of 48.4 puts him squarely in the middle of graduating high school seniors. Given that the DSM-5 states that "[i]ntellectual disability has an overall general population prevalence of approximately 1%," Defendant's achievement near the middle 50% of the high school senior population is fundamentally inconsistent with a diagnosis of intellectual disability.

## II.     The Court agrees with Dr. Denney's conclusion and diagnosis.

The Court agrees with Dr. Denney's diagnosis and conclusion that Defendant does not have intellectual disability. Rather, he had an undiagnosed, untreated learning disorder in his early elementary years that may have warranted an intellectual disability diagnosis at that time. As he reached his teenage years, he grew out of this learning disorder and his general intellectual ability reached the below-average level. He does, however, have antisocial personality disorder.

This diagnosis explains not only Defendant's GED, but the long list of facts that are inconsistent with intellectual disability, namely that: Defendant is not a "pleaser" or compliant with authority; the letters he authored demonstrate a level of reasoning and writing ability inconsistent with intellectual disability; the investigation records show he could plan and strategize, and that he understood abstract rights like the right to remain silent; and the psychological evaluations performed by BOP doctors prior to his head injury do not note any intellectual disability.

Of course, Defendant currently suffers from a significant neurocognitive defect. This is the result of his end stage renal disease and 2007 head injury. As acknowledged by Defendant's own expert, Dr. Wood, this means a diagnosis of intellectual disability is not appropriate.

### III. Defendant has not carried his burden of showing any criterion for intellectual disability is present, much less all three.

The Court gives Dr. Reschly's conclusions no weight for the reasons discussed above. Without his expert testimony, Defendant cannot carry his burden of showing any of the three criterions for intellectual disability identified in the DSM-5 are satisfied.

For example, Defendant attempts to meet his burden of showing significant deficits in adaptive behavioral skills during his developmental years by relying on Dr. Reschly's administration of the VABS-II to two of Defendant's younger cousins, Luella Harris and Bessie Harris. Dr. Reschly interviewed Luella Harris and Bessie Harris with VABS-II survey forms and then generated test scores from the answers. Essentially, the test scores were based on the observations of children who were both younger than the subject, who never lived in the same house as the subject, filtered through the memories of two adults trying to remember events that occurred forty to fifty years earlier. And the memory of one of these individuals, Luella Harris, had been rendered unreliable by a series of strokes.

To say the VABS-II survey forms should not be used this way is an understatement. The VABS-II manual states:

> Careful selection of a qualified respondent is critical for obtaining valid results with either Survey form. The respondent *must* be the *adult* who is most familiar with the everyday behavior of the individual being evaluated. In general, the respondent should have frequent contact with the individual (preferably every day) over an extended period of time to allow multiple opportunities to observe the individual's responses to a variety of environmental demands.

> For a child living at home, a parent is usually the most appropriate respondent. In some cases, however, another adult family member (for example, a grandparent assuming major caregiving responsibilities) could be a more suitable choice.

VABS-II, Survey Forms Manual, at 12 (emphasis added). Neither Luella Harris or Bessie Davis qualify as competent informants because they were not adults at the time and neither had frequent contact over an extended period of time with Defendant. Hence, these purported VABS-II test results are completely unreliable, as are Dr. Reschly's conclusions concerning Defendant's developmental years which are based upon them.

Defendant's attempt to shore-up this analysis by calling Ms. Thompson-Dunn and Ms. Shipman as witnesses is unavailing. Both had infrequent contact with Defendant, and Ms. Thompson-Dunn's memory is suspect because she has taken lot of pain medication.

In sum, there is no credible evidence that Defendant had significant deficits in adaptive behavioral skills during his developmental years, or that any of the other criterion identified in the DSM-5 are satisfied.

## Conclusion

The Court finds the Government has demonstrated Defendant does not have intellectual disability. Defendant has not carried his burden of proving intellectual disability by a preponderance of the evidence, and the motion (Doc. 158) is DENIED.

**IT IS SO ORDERED.**

Date: _September 22, 2017_                              /s/ Greg Kays_____
                                                       GREG KAYS, CHIEF JUDGE
                                                       UNITED STATES DISTRICT COURT